**Joel C. HARDY, Sr., et al.**

**v.**

**C. Tom SANSON et al.**

**Civ. A. No. 17538.**

United States District Court,
N. D. Georgia,
Atlanta Division.

March 30, 1973.

E. Lewis Hansen, Atlanta, Ga., for plaintiffs.

Hatcher, Meyerson, Oxford & Irvin, Atlanta, Ga., for defendants.

## ORDER

EDENFIELD, District Judge.

Plaintiffs are shareholders in Executive Equities, Inc. ["the corporation"], a Georgia corporation whose primary business is buying, selling and developing real property, particularly cemeteries. Defendant Sanson is the president of the corporation and defendants Martin, Fountain, Carter and Dunwoody are on the board of directors. Plaintiffs allege that defendants successfully engineered a takeover of the corporation from plaintiff Tallant's control, and that in so doing they violated the Securities Act of 1933 and the Securities Exchange Act of 1934. Jurisdiction is asserted under 15 U.S.C. §§ 77v and 78j, and 28 U.S.C. §§ 1331 and 2201.

Dispensing with the customary conclusory epithets, plaintiffs' complaint is based upon the following factual allegations. The corporation has a five-man board of directors and two classes of stock, Class A common which is entitled to elect two directors by a majority vote of its shareholders and Class B common which is entitled to elect three directors. Prior to the transactions complained of, plaintiff Tallant owned 60% of the Class B stock and defendant Sanson owned 40% of the stock, control of the corporation thus effectively being in the hands of Tallant.

In November of 1971 the corporation had registered with the Georgia Securities Commissioner 600,000 shares of Class A stock for sale to Georgia residents only at a price of $5.00 per share. On March 2 and 8, 1972, meetings of the board of directors were held at which the defendant president and defendant directors voted to terminate the November 1971 offering and to register and issue in its stead $1,900,000 shares of Class B common stock, for intrastate sale only at $3.00 per share. The secretary of the corporation was instructed to notify defendant Sanson and plaintiff Tallant of their preemptive right, valid for a period of thirty days, to acquire shares of the new Class B offering for cash in proportion to their present holdings. Notice was given to Tallant on March 16, 1972 advising him that his right would expire on April 17, 1972, and the new issue was duly registered with the Commission on April 5, 1972. Sanson purchased 21,000 shares of the new issue on or prior to the April 17th deadline. Tallant, however, waited until April 28, 1972 to tender his subscription price for 12,000 shares, and his tender was refused by the corporation's president, defendant Swanson.[1] At some time on or about April 17th it is alleged that Sanson was paid a 15% commission by the corporation, totaling $9,450.00, for the sale to himself of the 21,000 Class B shares.

Against this background, plaintiffs allege that defendants have violated Section 17 of the Securities Act of 1933, 15 U.S.C. § 77q; Section 14 of the Securities Exchange Act of 1934, 15 U.S.C. § 78n; and Section 10(b) of the 1934 Act, 15 U.S.C. 78j(b), as implemented by Rule 10b–5, 17 C.F.R. § 240.10b–5, of the Securities and Exchange Commission, in the following respects:

(1) The March 23, 1972 prospectus, issued in conjunction with the sale of the Class B common stock, did not disclose that defendant Sanson would receive a 15% commission on the purchase of his own stock, and it failed to dis-

---

1. Plaintiffs also allege that pursuant to Tallant's demand a special shareholders' meeting was set by the defendant directors for May 11, 1972, and that April 28, 1972 was set as the record date for the meeting. Plaintiffs complain that by refusing to accept Tallant's tender, Sanson denied Tallant his right to be a holder of record on April 28, 1972 of an additional 12,000 shares of Class B stock. While this allegation may well be true, the court is not clear as to its relevance. Nothing in these particular facts makes out a violation of federal securities laws, and the court is doubtful that these allegations assist in raising a claim under any law.

close that the purpose of the issuance of Class B shares was to enable defendants "to oust plaintiff Tallant, the organizer of the company and upon whose management judgment and experience the shareholders depended for the prudent management of their investment";

(2) The annual shareholders' meeting of November 21, 1972 was conducted unlawfully in that 21,000 shares of Class B stock "unlawfully" issued to Sanson and 500 shares "unlawfully" issued to each of the other four directors were allowed to be voted according to a voting trust agreement entered into by defendants, for the purpose of electing a majority of defendants' candidates to the board of directors;

(3) The 1972 annual report discloses a discrepancy between the net proceeds which would have been realized by the corporation from its sales of the Class A shares registered in November 1971 and the Class B shares registered in April 1972, according to the respective prospectuses for the two issues, and the amount of the proceeds which were actually received. This discrepancy calls into question the truthfulness of the prospectuses of November 2, 1971 and March 23, 1972;

(4) The 1972 annual report does not disclose that Sanson received, in effect, a 15% discount on his purchase of 21,000 Class B shares of stock; and

(5) The proxy statement issued by defendants in November 1972 failed to disclose that defendants had conspired to seize control of the corporation by canceling the 1971 issue of Class A stock and floating the 1972 issue of Class B stock, and that Sanson had received a 15% commission on his own purchase of the Class B shares.

The action is presently before the court on defendants' motion to dismiss for plaintiffs' failure to state a claim upon which relief can be granted. The motion will be granted without prejudice, and plaintiffs will be given an opportunity to file an amended complaint.

Section 17 of the 1933 Act states in relevant part that, "It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—(1) to employ any device, scheme, or artifice to defraud, or (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." Plaintiffs' claim under this section must fail for at least two reasons.

■ First, there is no allegation that the securities in question are governed by the Act. Indeed, plaintiffs allege to the contrary that the sale of both the 1971 and 1972 issues were restricted to Georgia residents only, and that Executive Equities is a Georgia corporation whose primary business is buying and developing cemeteries. On the basis of the record before it, the court will not presume that this business is conducted outside the State of Georgia. Accordingly, the stock issued by the corporation seems squarely within Section 3(a)(11), 15 U.S.C. § 77c(a)(11), which states that the provisions of the Act shall not apply to "Any security which is a part of an issue offered and sold only to persons resident within a single State or Territory, where the issuer of such security is a person resident and doing business within or, if a corpora-

tion, incorporated by and doing business within, such State or Territory."

■■ Second, the court agrees with the analysis of Professor Loss that Section 12(1) of the 1933 Act expressly provides the exclusive civil remedy for a violation of Section 17(a), and that the purpose and nature of the Act do not justify the finding of an implied remedy. *See* 3 Loss, Securities Regulation 1784–85 (2d ed. 1961); Hamrick v. Tico, Inc., Civil Action No. 14880 (N.D. Ga. decided June 26, 1972; Dyer v. Eastern Trust & Banking Co., 336 F. Supp. 890, 903–905 (D.C.Me.1971), and cases cited therein.

Section 12(2) of the Act, 15 U.S.C. § 77$l$(2), provides in effect that anyone who offers or sells a security in a way which would violate Section 17(a), "shall be liable *to the person purchasing such security from him*, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security." (Emphasis added.) The court has examined the complaint from beginning to end and fails to find an allegation that any of the plaintiffs ever purchased from the defendants, either directly or indirectly through the corporation, shares of either the November 1971 or the April 1972 issues. Section 17(a) specifically makes certain practices unlawful "in the offer or sale of any securities" and Section 12 specifically gives a cause of action "to the person purchasing such security." The language of the 1933 Act is clear and plaintiffs' claim does not come within its terms.

■ Plaintiffs' claim under Section 10(b) of the 1934 Act as implemented by Rule 10b–5 of the Securities and Exchange Commission[2] must also be dismissed. Plaintiffs' claim is barred by the holding in Birnbaum v. Newport Steel Corp., 193 F.2d 461 (2d Cir. 1952), cert. denied 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356, long recognized as the controlling authority, that standing to sue under the language "in connection with the purchase or sale of any security" is limited to buyers or sellers of the securities in question. As noted above, plaintiffs have failed to allege that any of their number bought shares of either the Class A or Class B issues. Rather, plaintiffs have argued in their brief in opposition to defendants' motion to dismiss that this action is akin to Schoenbaum v. Firstbrook, 405 F.2d 200 (2d Cir. 1968), substantially modified on rehearing, 405 F.2d 215 (2d Cir. 1968), where the court recognized a claim against self-dealing directors, and that in any event Rule 10b–5 proscribes deceptive and manipulative activity "in connection with" a purchase or sale, and that "a pure contract involving a purchase or sale of securities" is not required.

Plaintiffs' reliance on *Schoenbaum* is misplaced. In that case, unlike this one, plaintiffs brought a stockbrokers' derivative action in behalf of the corporation, Banff Oil, Ltd., alleging that the defendants had fraudulently induced the *corporation to sell* 770,000 shares of its stock at a price which defendants knew to be inadequate in light of Banff's recent discovery of oil. The Court found that the issuance of its stock to the corporate purchaser, Acquitaine Company, Ltd.,

2. Rule 10b–5 makes it unlawful "for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

  (a) To employ any device, scheme, or artifice to defraud,

  (b) To make any untrue statement of a material fact or to omit to state a

material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

  (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security."

was a *sale of securities* within the meaning of Section 10(b) and Rule 10b–5, and so allowed the action to proceed. In the present case plaintiffs are suing in their own right, not on behalf of the corporation. The complaint fails to allege that plaintiffs are either purchasers or sellers and the limitations placed by *Birnbaum* on the potential extraordinary reach of 10b–5, are fully applicable to deny plaintiffs a federal cause of action. *See* Rekant v. Dresser, 425 F.2d 872 (5th Cir. 1970).[3]

■ Plaintiffs' assertion that a pure contract of purchase or sale is unnecessary to support an action under Section 10(b) of the 1934 Act is of no help to the claims set forth in their complaint. While it is true that the Second Circuit Court of Appeals has held that it is unnecessary to prove a "consummated, or closed, purchase or sale as condition to the institution of [a suit under Section 10(b)]", Commerce Reporting Co. v. Puretec, Inc., 290 F.Supp. 715, 718 (S. D.N.Y.1968); *see* Opper v. Hancock Securities Corp., 367 F.2d 157 (2d Cir. 1966), aff'g, 250 F.Supp. 668 (S.D.N.Y. 1966), the requirement of "purchase" remains. It remains at least to the extent that there must exist some form of contractual arrangement between defendant "seller" and plaintiff "purchaser." The requirement is present even in those cases giving the most liberal interpretation to the *Birnbaum* doctrine.

In Commerce Reporting Co. v. Puretec, Inc., *supra,* cited by plaintiffs in support of their position, for example, Puretec entered into an agreement with plaintiffs "or their assigns" to sell all of Puretec's capital stock. In addition plaintiffs were appointed Puretec's agent to effectuate the sale to an assignee, and

in fact plaintiffs and defendant did work out an agreement whereby Puretec agreed to sell its stock in consideration for the stock of plaintiffs' assignee, Granite Equipment Company. The acquisition by Granite was to be publicly announced at a meeting of the New York Society of Security Analysts, but before the announcement was made, defendant Puretec secretly negotiated with and sold the stock to another purchaser. In considering the applicability of *Birnbaum's* standing requirements, the court found that "Although failure to comsumate *the purchase agreement* might sometimes make it impossible for the plaintiff to prove damages and thus preclude invoking relief under § 10(b) of the Exchange Act, in this case the plaintiffs' simultaneous agreement to assign the [Puretec] stock to Granite indicates the availability of an appropriate measure." 290 F.Supp. 715, at 719 (emphasis added).

■■ In contrast to *Puretec* the only incident alleged in the present case resembling a proposed sale and purchase agreement was the thirty-day preemptive right extended to plaintiff Tallant. Tallant, however, simply failed to exercise his right within the designated period and there is no allegation that this failure was in any way owing to fraud on the part of the defendants. Insofar as plaintiffs' complaint attacks defendants for their refusal after April 17, 1972 to sell Tallant any Class B common stock, it fails to allege that there was any agreement by defendants that they would do so.

This lack of a prior contractual relationship is fatal to plaintiffs' claim that they should be afforded standing under the rationale of Opper v. Hancock

3. Plaintiffs' reliance on Ruckle v. Roto American Corp., 339 F.2d 24 (2d Cir. 1964), is similarly unfounded as there again the suit was brought by plaintiff shareholders in behalf of a corporation, the Court finding that "the issuance by a corporation of its own shares is a 'sale' to which the anti-fraud policy expressed in the federal securities laws extends."

339 F.2d 24, at 27. Also erroneously cited by plaintiffs is Globus v. Law Research Service, Inc., 287 F.Supp. 188 (S.D.N.Y.1968), aff'd, 2d Cir., 418 F.2d 1276, where the action was brought by "13 *purchasers* of an issue of common stock" of the defendant corporation. 287 F. Supp. 188, at 191 (emphasis added).

Securities Corp., *supra, Puretec,* and the other "aborted purchaser-seller" cases. *Compare* Mount Clemens Industries, Inc. v. Bell, 464 F.2d 339 (9th Cir. 1972), *with* Opper v. Hancock Securities Corp., *supra,* Commerce Reporting Co. v. Puretec, *supra,* Goodman v. H. Hentz & Co., 265 F.Supp. 440 (N.D.Ill.1967), Stockwell v. Reynolds & Co., 252 F.Supp. 215 (S.D.N.Y.1965). While the court recognizes that the purpose of Section 10(b) and Rule 10b–5 cannot be frustrated by a narrow, technical construction of the purchaser-seller requirement, it agrees with the well reasoned conclusion of the Court in Herpich v. Wallace, 430 F.2d 792 (5th Cir. 1970), that "only purchasers and sellers of securities involved in an alleged Rule 10b–5 violation—that is, securities in connection with which fraud has allegedly been committed—can show injury of the type the rule is meant to prevent." 430 F.2d 792, at 806. See also Iroquois Industries, Inc. v. Syracuse China Corp., 417 F.2d 963 (2d Cir. 1969), cert. denied, 399 U.S. 909, 90 S.Ct. 2199, 26 L.Ed.2d 561.

■ With very little discussion, plaintiffs allege that they have a claim under Section 14 of the 1934 Act, 15 U.S.C. § 78n.[4] Presumably this claim is meant to allege that the November 1972 proxies contained false or misleading statements in violation of Rule 14a–9 of the Securities and Exchange Commission, 17 C.F.R. § 240.142–9. The complaint, however, does not state why the proxy statements were issued, what they contained, or how they resulted in injury to the plaintiffs. Lacking even minimal factual allegations in support of the claimed violation, plaintiffs' claim under this section must be dismissed. The court is bound to construe plaintiffs' pleading liberally to see if under any set of facts they are entitled to relief by reason of federal law, Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), but the court is not called upon to be clairvoyant and discern facts where none are alleged.

A more serious failing, which may not be capable of correction by an amended complaint, is that the proxy statements complained of appear not to be controlled by Section 14 of the Exchange Act. Section 14 as set forth in 15 U.S.C. § 78n is applicable to the solicitation of "any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to Section 78l of this title." The court notes that the November 1971 and April 1972 issues in question come within none of the provisions of Section 78l, Section 12 of the 1934 Act. There is no allegation that the stock was sold on a national securities exchange, Section 78l(a), 15 U.S.C., or that the corporation has "total assets exceeding $1,000,000 and a class of equity security (other than an exempted security) held of record by five hundred or more but less than seven hundred and fifty persons."[5] Section 78l(g)(1), 15 U.S.C. Because of the insufficiency of the facts alleged in support of the claim, and because it appears that Section 14 is not applicable to the proxies solicited, plaintiffs' claim under Section 14 of the 1934 Act will be dismissed.

The court is unable to say with certainty whether the omissions in plaintiffs' complaint are due to oversight or

---

4. Section 14 of the Securities Exchange Act of 1934, as set forth in 15 U.S.C. § 78n, reads in relevant part: "(a) It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."

5. Or that the corporation has "total assets exceeding $1,000,000 and a class of equity security . . . held of record by seven hundred and fifty or more persons . . ." 15 U.S.C. § 78l(g)(1) (A).

whether they stem from actual absence of the necessary facts. This being so, the complaint is DISMISSED with leave to serve an amended complaint within 20 days from the date hereof.