**W. Henry duPONT, on behalf of himself and on behalf of a class of purchasers of the common stock of defendant University Computing Company similarly situated, Plaintiff,**

v.

**Sam WYLY et al., Defendants.**

**Civ. A. No. 4630.**

United States District Court, D. Delaware.

Dec. 28, 1973.

brought this action against that corporation, various of its present and former officers and directors, a holding company owning certain UCC securities, and Arthur Young & Co., the corporation's independent public accountant. The complaint alleges violation of Section 12(2) and 17(a) of the Securities Act of 1933, Sections 9(a), 10(b), 13(a) and 14(a) of the Securities Exchange Act of 1934, and various rules promulgated thereunder by the Securities and Exchange Commission. The violations are said to arise from misrepresentations and omissions in registration statements, proxy statements, annual reports, public announcements, press releases and "otherwise," as well as in filings with the SEC and the New York Stock Exchange. Additionally, four of the defendants are alleged to have engaged in open market purchases of UCC stock with the purpose and effect of raising the price of that security and inducing its purchase by others. Jurisdiction is conferred by 15 U.S.C. §§ 77v, 78aa.

Stated broadly, plaintiff asserts that the numerous security law violations he alleges evidence a continuing conspiracy among the defendants to perpetrate a "fraud on the market." That is, plaintiff says the defendants successfully conspired to keep the market price of UCC stock at artificially high levels during the relevant period by issuing false reports and statements, engaging in misleading accounting techniques and "pegging" the price of UCC shares on the market. Plaintiff alleges that this conspiracy was not exposed to public view until the spring of 1973 when UCC announced an $83 million dollar loss for fiscal year 1972.

William E. Taylor, Jr., Wilmington, Del., Blank, Rome, Klaus & Comisky, Philadelphia, Pa., for plaintiff.

Henry N. Herndon, Jr., and Jay Paul James, of Morris, James, Hitchens & Williams, Wilmington, Del., John G. Harkins, Jr., and Barbara W. Mather, of Pepper, Hamilton & Scheetz, Philadelphia, Pa., for certain individual defendants.

H. James Conaway, Jr., and Ben T. Castle, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., White & Case, New York City, for defendant Arthur Young & Co.

## OPINION

STAPLETON, District Judge:

W. Henry duPont, a shareholder of defendant Wyly Corporation (formerly University Computing Company, and herein referred to as "UCC"), has

Mr. duPont is the record owner of five shares of UCC stock purchased on May 19, 1971.[1] In this action he seeks to represent a class of shareholders which includes all those persons who purchased shares of common stock of UCC during

---

1. Mr. duPont's stock represents an investment of approximately $160.

the period January 1, 1971 to April 19, 1973, the date of the filing of the complaint.

The case is currently before the Court on a motion under Rule 23 for a determination of whether it may proceed as a class action, and a motion under Rule 12(b)(6) to dismiss the complaint for failure to state a claim.

## I. CLASS ACTION STATUS.

### A. *The Factual Background.*

Plaintiff's relationship with UCC is complex. Mr. duPont, through his wholly owned corporation Sci-Tek, Incorporated, is a competitor of UCC and has also had extensive business with that corporation.

Sci-Tek has competed with UCC since 1966 in the computer utility service business.[2] On December 31, 1970, Sci-Tek entered into a joint venture with United Software Corp. ("United") calling the joint venture "Speed Pak." The joint venture sought to market under the Speed Pak name a system which included memory cores compatible with a Univac 1108 computer, software for the 1108 computer, and service. The sole source of supply for the essential memory cores, other than Univac itself, was Weismantel Associates, Inc. ("Weismantel"). On December 19, 1970 Sci-Tek entered into a contract with Weismantel for the purchase of ten memory cores.

During the course of 1970, Weismantel came under the control of UCC. On April 22, 1971 Sci-Tek and its joint venturer United entered into "an agreement in principle" with UCC which provided for control of Weismantel to pass to the joint venturers, and for the financing of such transfer by, among other means,

a sale and lease back of certain Sci-Tek property. On the same date Sci-Tek executed and delivered to the First National City Bank ("FNCB") a promissory note in the amount of $125,000; UCC was a guarantor of this note. For reasons not altogether clear from the papers of record here, the deal contemplated by the agreement in principle never came to fruition. The joint-venturers cancelled their order for the ten memory cores. Thereafter, on May 13, 1971, Weismantel instituted a Chapter XI proceeding in the bankruptcy court. Five days later Mr. duPont purchased his five shares of common stock in UCC.

In November 1971 Mr. duPont, along with his company Sci-Tek, United and SpeedPak, sued UCC and another corporation alleging violations of various of the anti-trust laws that arose in part from the transactions described above.[3] Specifically, the plaintiffs alleged that during 1970 Weismantel had come under the control of UCC and that UCC had exercised that control to prevent Speed Pak from obtaining the memory cores necessary to the success of its project. Damages of $50,000,000 were asserted which, when trebled as requested, would total $150,000,000.

In December 1971, UCC, which had been called upon to pay the note that Sci-Tek and United had given to FNCB and on which it was the guarantor, brought an action on the note against the makers.[4] Sci-Tek and United counterclaimed against UCC for fraud and deceit, demanding damages of $10,000,-000. Both of these suits are pending and have not proceeded beyond the discovery stage. In both, Mr. duPont's interests are represented by the law

---

2. The facts recited here are gleaned in part from two complaints filed by Mr. duPont against UCC in other actions currently pending in the United States District Court for the Eastern District of Pennsylvania, which have been made a part of the record here, as well as from the complaint and affidavits in

this case. They are not disputed in this record.

3. Sci-Tek, Inc. v. University Computing Co., Civ.A. 71–2696 (E.D.Pa.).

4. University Computing Co. v. Sci-Tek Computer Center, Inc., Civ.A. 73–1197 (E.D.Pa.).

firm that represents him in this lawsuit.

After the filing of the present complaint, Mr. duPont instituted still another action against UCC in this Court. That action, captioned W. Henry duPont v. University Computing Company, Civil Action No. 4655, and filed on May 16, 1973, alleges that the proxy statement issued by UCC in conjunction with its 1973 annual meeting of shareholders violated Section 14 of the Securities Exchange Act of 1934 and Rule 14 promulgated by the Securities & Exchange Commission.

The current net worth of UCC is approximately $62,000,000.

### B. *The Legal Standard.*

Rule 23(a) sets forth four prerequisites to the maintenance of a class action. Under that section, it must appear that:

1) the class is so numerous that joinder of all members is impractical,

2) there are questions of law or fact common to the class,

3) the claims or defenses of the class representatives are typical of those of the class, and

4) the representative party will fairly and adequately protect the interests of the class.

Additionally, the Court must find, as the plaintiff alleges, that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." F.R.C.P. 23(b)(3).

The plaintiff bears the burden of establishing that these requisites for a class action are present, Weisman v. M. C. A., Inc., 45 F.R.D. 258 (D.Del. 1968); Rossin v. Southern Union Gas Co., 472 F.2d 707, 712 (10th Cir. 1973). I am nonetheless mindful of the observation of the Third Circuit in Kahan v. Rosenstiel, 424 F.2d 161, 169 (1970) that:

As the Tenth Circuit said in Esplin v. Hirschi [402 F.2d 94] since the effectiveness of the securities laws may depend in large measure on the application of the class action device "the interests of justice require that in a doubtful case, such as was presented here when considered by the trial court, any error, if there is to be one, should be committed in favor of allowing the class action."

Defendants challenge the propriety of maintining this suit as a class action on a number of grounds. Because this Court has concluded that plaintiff does not present adequate assurance that he is able to "fairly and adequately protect the interests of the class," F.R.C.P. 23(a)(4), it is unnecessary to inquire whether the other attributes of a proper class action are present here.

### C. *Conflicting Interests.*

The requirement that "the representative parties will fairly and adequately protect the interest of the class" plays a crucial role in the class action scheme of amended Rule 23. Since that scheme holds the potential of binding class members who have no actual knowledge of the suit, the requirements of due process, as well as the necessity for confidence in the judicial process, demands assurance that representative parties can be counted upon to faithfully defend the interests of all members of the class. Subdivision (a)(4) of Rule 23 was designed to provide that assurance.

Judge Weinstein has explained the task of the court in applying this subdivision and the elements which characterize "fair representation" as follows:

Under the new rule . . . members of the class not before the court are bound unless they affirmatively exercise their option to be excluded

from the action. They may find themselves bound even though they were not actually aware of the proceeding. In such circumstances, the contention that adequate representation is lacking becomes weighty and "the interests of the affected persons must be carefully scrutinized to assure due process of law for the absent members." Carroll v. American Federation of Musicians, 372 F.2d 155, 162 (2d Cir. 1967). See e. g., Fischer v. Kletz, 41 F.R.D. 377, 383 (S.D.N.Y. 1966).

Two requirements need to be met in order for the court to be satisfied that the representative parties will adequately protect the interests of the class they seek to represent. First, "the interests of the unnamed persons * * * [must be] closely identified with the interests of the representatives"—i. e., they must be members of the class sharing common issues and interests. . . . Second, the court must be assured that "the representatives [will] put up a real fight." Chafee, Some Problems of Equity 231 (1950).

Dolgow v. Anderson, 43 F.R.D. 472, 493–494 (S.D.N.Y.1968). Because the members of the class and their representative must share common interests, "diverse and potentially conflicting interests within the class are incompatible with the maintenance of a . . . class action." Carroll v. American Federation of Musicians, 372 F.2d 155, 162 (2nd Cir. 1967).

■ Two circumstances of this case each act to deprive this Court of the assurance of subdivision (a)(4) compliance that it must have before permitting a suit to proceed as a class action.

First, plaintiff's position as a potential beneficiary of a recovery on $160,-000,000 in claims against UCC gives him an interest which conflicts with the interest of the other members of the class he seeks to represent. For example,

execution of a judgment in plaintiff's favor in the anti-trust suit for $150,-000,000 would in all likelihood render UCC incapable of responding in damages to a later judgment in this case. Conversely, in light of UCC's financial position, satisfaction of an earlier judgment here would decree *pro tanto* UCC's ability to respond to a later judgment of the amount prayed for in the anti-trust case. Since plaintiff will receive the benefit of a large percentage of any judgment in the anti-trust suit, but will recover only a small portion of any recovery here, control over the prosecution of both cases presents him with both the opportunity and the incentive to protect his potential of recovery in the anti-trust suit by proceeding slowly here or indeed by "throwing" this suit and barring class members from raising the same questions in later suits.

Second, in addition to this direct and specific conflict, the many faceted relationship between Mr. duPont and UCC suggests that this suit may be an attempt to open still another front in a wide ranging battle having objectives unrelated to those shared by the class. As previously noted, Mr. duPont is a competitor of UCC. The amount, timing, and other circumstances of his purchase of UCC shares is at least consistent with the idea that his purpose was to acquire standing for subsequent litigation. Within a period of months Mr. duPont initiated judicial proceedings against UCC on four separate claims. These facts do not, of course, bar Mr. duPont from pressing the claims here involved on his own behalf. They do indicate that situations may arise in the course of this lawsuit in which the judgment brought to bear by Mr. duPont could be influenced by considerations foreign to the interests of the class. For example, if Mr. duPont has a desire to wage war with those who control UCC, he would be less favorably disposed than other members of the class to any overtures of settlement.

Plaintiff's response to these dangers is three-fold. First he argues that the question of adequate representation under Rule 23(a)(4) requires only a comparison of the representative party's interest *in the issues the suit raises* with the interest of the class in those issues. He asserts that his interest as a shareholder who was led to purchase securities on false information is precisely congruent with the interests of the class of shareholders he seeks to represent, and, therefore, adequate to assure the quality of his representation.

In assessing alleged conflicting interests some courts have stated that "such antagonism as would defeat the representation of a class must be as to the subject matter of the suit. Redmond v. Commerce Trust Co., 144 F.2d 140 (8th Cir. 1944)" First American Corp. v. Foster, 51 F.R.D. 248 (N.D.Ga.1970). I doubt that these courts intended what the plaintiff in this case has read their opinions to say. But in any event, I believe plaintiff's formulation of the rule unwisely attempts to restrict the scope of an inquiry that should encompass all possible antagonisms between the interests of the representative and those of the class. See United Egg Producers v. Bauer International Corp., 312 F.Supp. 319 (S.D.N.Y.1970); Sanders v. John Nuveen & Co., Inc., 463 F.2d 1075 (7th Cir. 1972); Maynard, Merel & Co. v. Carcioppolo, 51 F.R.D. 273 (S.D.N.Y. 1970); Free World Foreign Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26 (S.D.N.Y.

1072). When all of the surrounding circumstances in this case are viewed from this perspective, the fact that Mr. duPont asserts a claim arguably "typical" of those of the absent class members, F.R.C.P. 23(a)(3), does not fully assure the adequacy of his representation as required by subdivision (a)(4).

This case is closely analogous to those cases holding that where a person is a member of two groups with distinct and conflicting relevant interests and, on balance, his economic interest in one substantially outweighs his economic interest in the other he is unfit to represent the second group in a class suit. See Sanders v. John Nuveen & Co., Inc., 463 F.2d 1075 (7th Cir. 1972); United Egg Producers v. Bauer International Corp., 312 F.Supp. 319 (S.D. N.Y.1970).

Plaintiff's second contention is that even assuming *arguendo* that a potential for a conflict exists, the favor exhibited by federal courts for class actions in securities litigation, e. g., Kahan v. Rosenstiel, *supra*, VI Loss, Securities Regulation, 3938 (Supp.1969), coupled with the broad powers of supervision conferred upon the Court by Rule 23(d), Kauffman v. Dreyfus, 434 F.2d 727 (3rd Cir. 1970), caution against an adverse determination of his class action allegations at this early stage of litigation.

While the powers enumerated in the rule are indeed broad,[5] this Court is un-

---

5. Rule 23(d) provides as follows:

(d) *Orders in Conduct of Actions.* In the conduct of actions to which this rule applies, the court may make appropriate orders: (1) determining the course of proceedings or prescribing measures to prevent undue repetition or complication in the presentation of evidence or argument; (2) requiring, for the protection of the members of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; (3) imposing conditions on the representative parties or on intervenors; (4) requiring that the pleadings be amended to eliminate therefrom allegations as to representation of absent persons, and that the action proceed accordingly; (5) dealing with similar procedural matters. The orders may be combined with an order under Rule 16, and may be altered or amended as may be desirable from time to time.

able to perceive how they might be creatively employed to adequately guard against the dangers which it has found inherent in Mr. duPont's representation of the class. There are practical limits to the effectiveness of judicial supervision. A court will rarely know, for example, of the conduct of a party in settlement negotiations which do not bear fruit. Nor does a court ordinarily have sufficient information about a case of this kind prior to its trial to be able to say with confidence that particular discovery is motivated primarily by a desire to delay. These practical limitations on the Court's monitoring ability, in my judgment, make judicial supervision an inadequate substitute for a representative plaintiff having interests synonymous with the class.

Plaintiff's third and final response to the conflict of interest claim is that, if he is permitted to represent the class, he will not press the damage claim asserted in the complaint against UCC, but will instead pursue recovery from the other defendants. This offer, contained in plaintiff's brief, dramatizes rather than alleviates Mr. duPont's conflicting interests. If there is a meritorious claim against UCC, it is certainly not in the interest of the class to have this solvent defendant eliminated as a possible source of recovery. Plaintiff's "waiver" would not remove the damage claim from the arena of this litigation and save it for subsequent contest elsewhere. Other relief is sought against UCC based upon the same transactions which are alleged to give rise to the damage claim. If this suit goes forward as a class action and that claim is not pressed and resolved here, familiar principles of *res judicata* would foreclose its being pressed elsewhere. Accordingly, what Mr. duPont here proposes is that the Court sanction a release of a possibly meritorious class claim in order to clear the way for him to represent the class on other claims. The Court declines to do so.

The foregoing analysis of the class action question has necessarily involved speculation about what might happen at various stages of this suit. I need not find that the events hypothesized represent plaintiff's present intent. His motives may be beyond reproach. But the assurance demanded by due process and Rule 23 is that the representative party in a class action be free of any interest which holds the potential of influencing his conduct of the litigation in a manner inconsistent with the interests of the class. That assurance is lacking here.

## II. THE MOTION TO DISMISS.

Denial of permission to proceed on behalf of the class does not, of course, bar plaintiff from pursuing this case in a personal capacity. Accordingly, it is appropriate to turn to defendants' motion to dismiss.

The complaint alleges violations by all the defendants of Section 10(b) of the Securities Act of 1934 and the SEC's Rule 10b-5 (Count I); Sections 12(2) and 17(a) of the 1933 Act (Count II); Section 13(a) of the 1934 Act and the SEC's Rules 13a-1, 13a-11 and 13a-13 (Count III); and Section 14(a) of the 1934 Act and SEC Rule 14a-9 (Count IV). In addition, Count V of the complaint charges four individual defendants with violating Sections 9(a) and 9(e) of the 1934 Act. All of the defendants assert that part of Count I and the entirety of the four remaining counts fail to state a legally sufficient claim. Defendant Arthur Young & Company ("Arthur Young") moves for the dismissal of the entire complaint as to it for failure to plead fraud with particularity as required by F.R.C.P. 9(b).

### Section 10 And Rule 10b-5

Count I alleges that on May 19, 1971 the plaintiff purchased five shares of UCC common stock which he continues to own. In effect, it then alleges a wide variety of materially misleading state-

ments and nondisclosures by the defendants, beginning sometime prior to January 1, 1971 and continuing to the present. The defendants, other than Arthur Young, concede the sufficiency of that portion of Count I which alleges misstatements and nondisclosures prior to May 19, 1971, the date on which plaintiff purchased his UCC stock. They assert, however, that the plaintiff has no standing under Section 10(b) and Rule 10b–5 to challenge any subsequent acts of the defendants and that, therefore, all such allegations should be dismissed.

■ The broad anti-fraud strictures of Section 10(b) and Rule 10b–5 impose liability only for proscribed acts committed "in connection with the sale or purchase of any security." The Third Circuit has recently reaffirmed the familiar principle that recovery under these provisions is limited to damages which the plaintiff has sustained in his capacity as purchaser or seller:

> Were we to extend the provisions of section 10(b) beyond the buyer or seller relationship, we would be judicially extending the terms of the statute and creating new rights. . . . Buyer or seller status is indispensable in establishing liability for damages under rule 10b–5.

Landy v. FDIC, CCH Fed.Sec.L.Rep. 94,-094 (3rd Cir. 1973) at 94,397.

To establish 10(b) liability, the plaintiff must demonstrate a causal relationship between his sale or purchase and the fraudulent practices of the defendant. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 860 (2nd Cir. 1968); In re Penn Central Securities Litigation, 347 F.Supp. 1327, 1333–1334 (E.D.Pa. 1972).

■ The only purchase of UCC stock made by the plaintiff occurred on May 19, 1971. Hence, the defendants are correct in their assertion that the plaintiff can only recover for fraudulent conduct committed before that date; subsequent conduct would lack the requisite causal relationship to the plaintiff's purchase. Nevertheless, while the defendants are liable to the plaintiff, if at all, only for fraudulent conduct which preceded his purchase, it does not follow that later acts of the defendants could not aid in establishing liability for that period. The defendants' practices after the plaintiff's purchase may well cast some light on the legality of earlier practices, especially if, as the plaintiff alleges, the defendants have engaged in a continuous course of conduct from 1971 to the present. Accordingly, I decline to strike plaintiff's allegation of misconduct subsequent to his purchase.[6]

### Sections 12(2) And 17(a) Of The Securities Act

■ Count II alleges violations of Sections 12(2) and 17(a) of the 1933 Securities Act. Incorporating the bulk of allegations contained in Count I, it charges the defendants with having "encouraged, cooperated, assisted, aided and abetted in the preparation and issuance" of prospectuses and registration statements that were materially false and misleading.

The defendants assert that these allegations are legally insufficient under Section 12(2) because the plaintiff has not maintained that he purchased his UCC stock from the defendants and, hence, has not satisfied 12(2)'s requirement of privity between buyer and seller. The plaintiff concedes that his purchase of UCC stock was an open market transaction and that the identity of the seller from whom he acquired that stock is unknown. Moreover, the plaintiff al-

---

6. Since Count I will not be dismissed, I need not now decide whether a plaintiff in Mr. duPont's position has standing to seek injunctive relief based on Rule 10b–5 violations occurring after his stock purchase when the alleged immediate effect of the violations was to maintain an inflated market price for his stock.

leges no 12(2) liability on the part of that seller, whoever he may be, nor does he allege that the seller innocently served as an agent for the defendants in consummating the particular transaction in which the plaintiff purchased his stock. Rather, his theory of 12(2) liability rests on the allegations that the defendants "conspired" with each other to issue false statements about UCC and that this scheme was designed to induce investors generally to purchase UCC stock.

Section 12(2) provides in pertinent part that "any person who:

> . . . offers or sells a security (whether or nor exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection(a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission.

shall be liable to the person purchasing such security from him. . . ."

15 U.S.C. § 77l(2).

Section 12(2) operates in tandem with Section 15 of the 1933 Act, which extends liability to persons who "control" a seller who is himself liable under 12(2):

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o.

The facts here alleged do not permit reliance on Section 15. "Controlling" persons are liable only when the "controlled" seller is himself liable, and the plaintiff's complaint neither identifies his seller nor asserts that this seller has himself committed an independent violation of Section 12(2). *Cf.* Dorfman v. First Boston Corporation, 366 F.Supp. 1089, 1093 (E.D.Pa.1972). The defendants' liability, then, must derive from Section 12(2) alone without reference to the secondary liability provisions of Section 15.

The language of Section 12(2) explicitly requires a buyer-seller relationship between plaintiff and defendant. Liability expressly resides in "any person who offers or sells a security" and then operates only in favor of the "person purchasing such security from him." A number of cases and commentaries have espoused the position that Section 12(2) requires privity between the plaintiff and defendant and that Section 15 provides the exclusive basis for derivative liability.[7] A few more recent cases[8] however, favor a relaxation of the

---

7. See *e. g.*, Winter v. D. J. & M. Investment and Construction Corp., 185 F.Supp. 943, 946 (S.D.Cal.1960); Wonneman v. Stratford Securities Co., CCH ¶ 91,034 (1957–61 Transfer Binder) (S.D.N.Y.1961); Barlas v. Bear, Stearns & Co., CCH ¶ 91,674 (1964–1966 Transfer Binder) (N.D.Ill.1966); 3 Loss, Securities Regulation, at 1719–1720.

8. See *e. g.*, Lennerth v. Mendenhall, 234 F. Supp. 59 (N.D.Ohio 1964); Hill York Corp.

privity rule and an extension of liability beyond the plaintiff's immediate predecessor in title to individuals who have aided, abetted or conspired with a seller who has himself violated Section 12 (2). This limited exception to the buyer-seller requirement of Section 12(2) seems designed to reach participants in a prohibited Section 12(2) sale who can technically be characterized neither as actual sellers nor as control persons under Section 15. It thus enlarges on Section 15's basic rationale of imposing liability on those who must share responsibility for a direct seller's independent transgressions of Section 12(2).

It is a far different matter to impose Section 12(2) liability on a defendant who is neither alleged to be a seller nor alleged to have aided and abetted a seller in a violation of that Section. This, in effect, is what the plaintiff urges, for he alleges only a conspiracy to issue materially misleading registration statements and not a conspiracy to aid and abet a violation of Section 12(2) by plaintiff's seller. Since the section clearly requires a violation by a seller as a pre-condition to any further, secondary liability, I conclude that plaintiff has failed to allege a violation of Section 12(2).

The defendants also assert that the plaintiff's claims under Section 17 (a) should be dismissed because no private cause of action exists under that section and because, even if one does, Section 17(a) is subject to the same privity requirement as Section 12(2). As the parties recognize, the cases that address these issues diverge in their holdings.[9] Moreover, neither issue has yet been resolved by the Third Circuit Court of Appeals.[10] At the same time, the status of the plaintiff's Section 17 (a) claim has no practical significance at the present stage of this suit. Plaintiff has here alleged a fraud claim under Rule 10b–5b. The alleged facts supporting that claim are the same as those relied upon in support of plaintiff's Section 17(a) claim. Accordingly, even if plaintiff is correct in his interpretation of Section 17(a), that Section in this context would be co-extensive in scope with Rule 10b–5. Under these circumstances, a delineation of the boundaries of Section 17(a) would be an academic exercise, irrelevant to the subsequent development of this case, and I shall defer addressing it until and unless the status of plaintiff's Section 17(a) claim assumes tangible factual or legal importance.[11] For this reason, I decline to dismiss Count II.

---

v. American International Franchises, Inc., 448 F.2d 680 (5th Cir. 1971); In re Caesars Palace Securities Litigation, CCH Fed.Sec.L. Rep. ¶ 94,005 (E.D.Pa.1973).

9. Holding that a private cause of action exists under Section 17(a) are Dack v. Shanman, 227 F.Supp. 26 (S.D.N.Y.1964); Pfeffer v. Cressaty, 223 F.Supp. 756 (S.D.N.Y. 1963); Thiele v. Shields, 131 F.Supp. 416 (S.D.N.Y.1955); Dorfman v. First Boston Corporation, 336 F.Supp. 1089 (E.D.Pa. 1972); Reaching the opposite result are Hardy v. Sanson, 356 F.Supp. 1034 (N.D. Ga.1973); Dyer v. Eastern Trust & Banking Co., 336 F.Supp. 890 (D.Me.1971); Trussell v. United Underwriters, Ltd., 228 F.Supp. 757 (D.Colo.1964); Greater Iowa Corp. v. McLendon, 378 F.2d 783, 788–789 (8th Cir. 1967). Requiring privity under Section 17 (a) are, *inter alia*, SEC v. American Beryllium & Oil Corp., 303 F.Supp. 912, 918 (S.D.

N.Y.1969); Holmberg v. Williamson, 135 F. Supp. 493 (S.D.N.Y.1955).

10. The plaintiff cites Kubik v. Goldfield, CCH Fed.Sec.L.Rep., ¶ 94,013 (3rd Cir. 1973) for the proposition that the Third Circuit has recognized a private cause of action under Section 17(a). While some language in that opinion reflects a tacit assumption that such a cause of action exists, there is no indication that the court considered and decided the issue and I am, therefore, disinclined to view *Kubik* as authoritative precedent on the point in this Circuit.

11. *Cf.* Pearlman v. Gennaro, CCH Fed.Sec.L. Rep. ¶ 94,006 (S.D.N.Y.1973) at 94,053: "At this initial stage of the proceedings, the court is not persuaded that it should dismiss the Section 17 claim at least in this instance wherein it is combined with a Section 10(b) claim in the same count." Here, although the 10(b) and 17(a) claims appear in dif-

### Section 13 Of The Exchange Act

Count III alleges that the defendants filed or assisted in the filing of reports required to be filed with the Securities Exchange Commission by Rules 13a–1, 13a–11 and 13a–13, which reports contained false statements or misleading omissions in violation of Section 13(a) of the Exchange Act.

Section 13(a) requires issuers of registered securities to file annual and current reports with the SEC. It provides no express right to damages for injuries caused by its violation. Section 13 is one of a number of provisions that require the filing of applications, documents and reports. See Sections 12(b), 12(g), 15(b)(1), 15A(a), 16(a) and 17 (a). Civil liability for failure to comply with these sections is provided in Section 18(a) of the Exchange Act.[12]

Plaintiff cites Kroese v. Crawford, CCH Sec.L.Rep. ¶ 91,262 (S.D.N.Y. 1963) and Kaminsky v. Abrams, 281 F. Supp. 501 (S.D.N.Y.1968) as authority for the proposition that there is an implied right to recover damages for violations of Section 13(a). Defendants rely upon the later cases of Smith v. Murchison, 310 F.Supp. 1079 (S.D.N.Y.1970) (dictum) and In re Penn Central Securities Litigation, 347 F.Supp. 1327 (E.D.Pa.1972) for the contrary proposition.

I am persuaded that Chief Judge Lord correctly resolved this question in the *Penn Central* case. By including an express and expressly limited private remedy in Section 18,[13] I think Congress clearly negated the existence of a further implied remedy for violation of Section 13. I agree that "where Congress has specifically authorized a remedy for violation of an act, the courts should not nullify the congressional scheme by implying a right of action on behalf of those not otherwise entitled to recover." In re Penn Central Securities Litigation, 347 F.Supp. 1327, 1340 (E.D.Pa.1972) modified CCH Sec.L.Rep. ¶ 93,980 (E.D.Pa.1973). Count III will be dismissed unless plaintiff, within thirty days from the date of this Opinion, amends his complaint, if he so desires and can do so, to allege a cause of action for violation of Section 18 of the Exchange Act.

### Section 14(a) Of The Exchange Act

Count IV of the complaint is founded upon Section 14(a) of the Exchange Act and Rule 14a–9 promulgated thereunder. Section 14 and Rule 14a–9 make it "unlawful for any person . . . to solicit or permit the use of his name to solicit any proxy [which is materially misleading]." The gist of Count IV, which incorporates relevant paragraphs of earlier counts, is that defendants "disseminat-

---

ferent counts, they rely on the same factual allegations.

12. Section 18, 15 U.S.C. § 78r, provides in pertinent part:
    (a) Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder . . . which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading. A person seeking to enforce such liability may sue at law or in equity in any court of competent jurisdiction. In any such suit the court may, in its discretion, require an undertaking for the payment of the costs of such suit, and assess reasonable costs, including reasonable attorneys' fees, against either party litigant.

13. Section 18, as quoted above, incorporates a purchaser-seller requirement and a reliance requirement as well as a species of good faith defense.

ed" or aided in the dissemination of proxy statements containing untrue statements of material facts.

■ Defendants contend that this pleading fails to state a claim because there is no allegation of causation between the violation and any injury to plaintiff. Hoover v. Allen, 241 F.Supp. 213 (S.D.N.Y.1965). Plaintiff responds that because he seeks only injunctive relief as to this count he need not allege any injury specially caused by the violation. I agree.

Read as a whole, the complaint alleges that plaintiff has been provided by defendants with a series of materially misleading proxy statements which have affected the fair and informed exercise of his corporate franchise and that similar solicitations will occur in the future unless defendants are enjoined. While I do not read the complaint to allege that plaintiff has suffered any economic injury or that any particular corporate action was taken as a result of the defective proxy solicitations, in my view a plaintiff states a claim for injunctive relief when he alleges that the exercise of his franchise has been impaired by a series of solicitations of proxies which violated Section 14(a) and that further violations are threatened for the future. The theory of corporate democracy which underlies the private right to enforce Section 14(a), J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), is incompatible with the notion that a shareholder has an enforceable federal right to honest proxy materials only when transactions approved by a shareholder vote in which he was misled has resulted in economic injury to him.

I do not question the validity of those cases which hold that a causal relationship between a violation of Section 14(a) and a corporate transaction causing harm to a shareholder needs to be established in order to recover money dam-

ages. See Hoover v. Allen, 241 F.Supp. 213 (S.D.N.Y.1965); Barnett v. Anaconda Co., 238 F.Supp. 766, 772 (S.D.N.Y.1965); Cohen v. Colvin, 266 F.Supp. 677 (S.D.N.Y.1967). *Cf.* Mills v. Sarjem Corp., 133 F.Supp. 753 (D.N.J. 1955). The prayer here for only injunctive relief makes this a different case.

Defendants' motion to dismiss Count IV will be denied.

### *Section 9 Of The Exchange Act*

■ Plaintiff asserts a claim on behalf of himself and the class he seeks to represent for injunctive relief and damages based on an alleged violation of Section 9(a) of the Exchange Act, 15 U.S.C. § 78i(a). Section 9(a) prohibits a broad range of devices designed to manipulate the open market price of a registered security. Section 9(e) provides the remedy for one injured by a Section 9(a) violation:

> (e) Any person who willfully participates in any act or transaction in violation of subsections (a), (b) or (c) of this section, shall be liable to any person who shall purchase or sell any security at a price which was affected by such act or transaction.
> . . .

In Count V of the complaint, Mr. duPont has alleged that:

> From time to time defendants Sam Wyly, Charles J. Wyly, Jr., Walter Haefner and Walter Haefner Holding A.G., by the use of the mails and means and instrumentalities of interstate commerce, and otherwise, willfully effected a series of transactions in the common stock of UCC raising the price of such security for the purpose of inducing the purchase or sale of such security by others, and for the purpose of pegging, fixing or stabilizing the price of such shares in contravention of the rules and regulations of the SEC.[14]

14. While this count incorporates allegations from earlier counts, even with this incorporation it seems intended only to allege a cause of action under subsection (a)(6) of Section 9.

Mr. duPont does not allege that he has purchased shares the price of which has been affected by such transaction. In fact, in his brief plaintiff admits that "(he) did not purchase or sell his stock at a price directly affected by the Section 9(a) manipulations." I read this comment, in the absence of any express allegation on the subject, as indicating that the series of stock transactions referred to in paragraph 45 did not precede the purchase of Mr. duPont's stock on May 19, 1971.

In light of the express requirement of Section 9(e) that liability be predicated on a purchase or sale at a price affected by the allegedly offending conduct, I conclude that plaintiff has not stated a claim upon which relief could be granted under Section 9. Rosenberg v. Hano, 121 F.2d 818 (3rd Cir. 1941).[15]

█ Plaintiff argues that even though he himself has suffered no injury, members of the class which he seeks to represent have been damaged and he ought to be permitted to litigate those claims. Even if I were persuaded that this were otherwise a proper class action, I think it settled that one who has suffered no wrong is not properly a member of a class seeking redress and, therefore, not an appropriate party to represent it. See Kauffman v. Dreyfus, 434 F.2d 727 (3rd Cir. 1970) and cases cited at 434 F.2d 736.

Count V will be dismissed.

### Defendant Arthur Young's Motion To Dismiss Under F.R.C.P. 9(b)

█ Defendant Arthur Young asserts that the plaintiff's allegations against it are not framed with the particularity F.R.C.P. 9(b) requires for charges of fraud and, therefore, moves for their dismissal.

Federal Rule 9(b) provides:

*Fraud, Mistake, Condition of the Mind.* In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Rule 9(b)'s requirement of particularity is designed "to prevent irresponsible and improvident aspersions and charges of fraud." 1A Barron & Holtzoff, Federal Practice and Procedure § 302 at 225 (Wright Ed., 1960); see also Segal v. Gordon, 467 F.2d 602, 607 (2nd Cir. 1970). To achieve this objective, the rule requires sufficient factual specificity to "apprise defendants of charges against them." Gottlieb v. Sandia America Corporation, 25 F.R.D. 223, 224 (E.D.Pa.1964); *cf.* Union Mutual Life Insurance Company v. Simon, 22 F.R.D. 186 (E.D.Pa.1958); Paramount Film Distributing Corp. v. Jaffurs, 11 F.R.D. 437, 439 (W.D.Pa.1951). Mere conclusory allegations of fraud, couched in the bare statutory language of the Securities Act, will not satisfy Rule 9(b). Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 444 (2nd Cir. 1971); O'Neill v. Maytag, 339 F.2d 764, 768 (2nd Cir. 1964); Reiver v. Photo Motion Corporation, 325 F.Supp. 214, 216 (E.D.Pa. 1971). Rather, the allegations must be accompanied by some delineation of the underlying acts and transactions which are asserted to constitute the fraud. Heart Disease Research Foundation v. General Motors, 463 F.2d 98, 100 (2nd Cir. 1972).

██ At the same time, Rule 9(b) must be harmonized with Rules 8(a) and 8(e) which require, respectively, that the pleading contain a short and general statement of the claim and that it be plain and direct. Paramount Film Distributing Corp. v. Jaffurs, *supra,* 11 F.R.D. at 838; United Insurance Company of America v. B. W. Rudy, Inc., 42 F.R.D. 398 (D.C.Pa.1967); 1A Bar-

---

15. If we misconstrue the intent, plaintiff may correct the matter by amending his complaint within thirty days.

ron & Holtzoff, Federal Practice and Procedure, 302 at 222, 223 (Wright Ed. 1960). Rule 9(b)'s requirement of particularity, then, does not entail an exhaustive cataloguing of facts but only sufficient factual specificity to provide assurance that the plaintiff has "investigated . . . the alleged fraud" and reasonably believes that a wrong has occurred. Segal v. Gordon, *supra*, 467 F.2d at 608.

■ While the plaintiff's complaint may not epitomize ideal draftsmanship, his allegations against Arthur Young satisfy the standard of Rule 9(b). Concededly, the plaintiff's complaint mentions Arthur Young only once, and then only in a statement that, in the conclusory language of the statute, alleges misstatements in violation of Section 10(b) and Rule 10b–5. However, the complaint then proceeds to itemize at length the particular misstatements and nondisclosures allegedly committed by *all* the defendants. Although no misstatements are expressly imputed to Arthur Young, the specific character of the plaintiff's allegations nevertheless serves to identify those wrongful activities in which Arthur Young is claimed to have engaged. For example, the complaint asserts that from January 1, 1971 through April 19, 1973, UCC's proxy materials, registration statements and annual reports were misleading in the following respects:

(1) defendants have misrepresented, failed to disclose and failed adequately to disclose (hereinafter "failed to disclose") the true earnings and revenues of UCC, its subsidiaries and affiliates during the relevant period, including:

(a) defendants failed to disclose that UCC was suffering and would continue to suffer losses in an amount in excess of $135 million;

(b) defendants failed to disclose that UCC had suffered a loss, which was revealed only in March 1973, in the sum of $83 million;

(c) defendants failed to disclose that such loss had been hidden earlier, in part, by offsets from UCC's insurance subsidiaries;

(d) defendants failed to disclose that there will be additional losses and write-offs, with the result that UCC will have a negative tangible net worth;

\*    \*    \*    \*    \*    \*

(2) defendants failed to disclose the inflated nature of UCC's acquisitions, mergers, and investments and that such transactions would cause the accrual of millions of dollars in excess of the cost or equity of such acquisitions, mergers and investments of UCC; that the capitalization of the excess of costs over assets acquired was of questionable value; and that amortization or write-off of such excess of costs would have to be accelerated;

(3) defendants failed to disclose the ways in which they have taken advantage of the public's lack of sophistication with regard to the computer industry so as to artificially inflate significant elements in UCC's financial statements;

(4) defendants failed to disclose the adverse financial and business circumstances of UCC reflected in its $40 million debenture offering through Kidder, Peabody & Co., Inc. in March 1970; . . .

While Arthur Young is linked to these misstatements only as a conspirator, it is apparent that the conspiratorial conduct charged against it entails the preparation of misleading accounting data and its acquiescence in the use of that data by other defendants.

Were the plaintiff to identify each specific document which contains these misstatements and then delineate the role Arthur Young played in its preparation, his complaint would be far more voluminous than its present thirty pages. Such prolixity is not compelled—indeed is discouraged—by the Federal Rules of Civil Procedure. For the pur-

poses of Rule 9(b), it is sufficient that the plaintiff has identified the categories of documents which allegedly contain misstatements and the nature of the information which he claims these documents either omit or misrepresent. These averments go well beyond the conclusory allegations that Rule 9(b) forbids; further specification of the allegedly wrongful role of Arthur Young is a task that the Federal Rules defer to the discovery stage of litigation.

Accordingly, defendant Arthur Young's motion to dismiss plaintiff's complaint for noncompliance with Rule 9(b) shall be denied.

For the foregoing reasons, (1) permission to proceed on behalf of the class will be denied, (2) defendants' motion to dismiss Counts I, II and IV will be denied and (3) Counts III and V will be dismissed unless plaintiff amends his complaint within thirty days.

Submit order.

### ON MOTION FOR REARGUMENT

Plaintiff has moved for reargument on a number of grounds. Reargument has been denied with respect to all save one.

While the Court has held that Section 18 of the Exchange Act is the sole vehicle by which a private right to damages can be asserted for breaches of Section 13(a) of that Act, it did not determine whether Section 13(a) will support an action for injunctive relief alone. The plaintiff urges that it will and asks the Court to reconsider its dismissal of Count III, which alleges that the defendants are engaged in a continuing course of conduct which violates Section 13(a).

Section 13(a) provides in part as follows:

> Every issuer of a security registered pursuant to Section 78*l* of this title shall file with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate for the purpose of protecting investors and to insure fair dealing in the security—
>
> 1. Such information and documents . . . as the Commission shall require to keep reasonably current the information and documents required to be included in or filed with an application or registration. . . .
>
> 2. Such annual reports . . . and such quarterly reports . . . as the Commission may prescribe.

As this Court noted in its original Opinion, Section 18 of the Act provides that any person filing a false or misleading document with the Commission shall be "liable to any person (not knowing that such statement was false or misleading), who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading." This Court concluded that Congress had contemplated that a person filing a false and misleading document under Section 13 (a) would be liable for damages only under the circumstances specified in Section 18. It does not follow, however, that Congress, by creating a specific cause of action for damages in Section 18, intended to foreclose any private cause of action for injunctive relief under Section 13(a).

I think it apparent that Congress, in adopting Section 13(a), intended to create a legal duty not only to file the documents required by the Commission, but also to file truthful documents. *Cf.* GAF Corporation v. Millstein, 453 F.2d 709 (2nd Cir. 1971) (holding that Section 13(d) imposes a legal duty not only to file "a statement" under certain circumstances, but also to file a truthful statement). This legal duty was created "for the proper protection of investors

and to insure fair dealing in the security."

In J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) the Supreme Court determined that there was a private right of action under Section 14(a) of the Act, despite the absence of express statutory language to that effect. It noted that:

[The] . . . broad remedial purposes [of the section] are evidenced in the language . . . which makes it "unlawful for any person . . . to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security . . . registered on any national securities exchange in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public *or for the protection of investors."* (Italics supplied.) While this language makes no specific reference to a private right of action, among its chief purposes is "the protection of investors," which certainly implies the availability of judicial relief where necessary to achieve that result.

The court in Borak went on to say:

. . . It is for the federal courts "to adjust their remedies so as to grant the necessary relief" where federally secured rights are invaded. "And it is also well settled that where legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done." Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Section 27

grants the District Courts jurisdiction "of all suits in equity and actions at law brought to enforce any liability or duty created by this title. . . . ."

■ These considerations seem equally apposite to Section 13(a). Permitting private suit for an injunction to enforce a duty created by Section 13(a), where the other prerequisites for injunctive relief are present, would serve the Congressional purpose of protecting investors and insuring fair dealing in the security.[16] While the Commission is authorized to seek such relief by the terms of Sections 21(e) and (f) of the Act, it has been repeatedly recognized, in other settings where the burden of policing the provisions of the Act is less onerous, that the Commission does not have adequate resources to assure complete effectuation of the policies that the Act enunciates.

■ The remaining question is whether the plaintiff in this case is an appropriate party to assert a right to injunctive relief under Section 13(a). Plaintiff has alleged that defendants have been engaged in a continuing course of conduct involving filings of misleading information concerning the common stock of UCC and that, as a result of this conduct, plaintiff purchased shares of that stock in 1971 at an artificially inflated price. He further alleges, that absent judicial interference, this course of conduct will continue in the future. Plaintiff does not allege any facts, however, which indicate that the continuation of this course of conduct will cause "injury in fact" to any interest of his within the zone protected by Section 13

---

16. Here, for example, it is alleged that the defendants have repeatedly filed documents with the Commission which, because of the underlying accounting practices, do not accurately reflect the condition of the corporation and which, accordingly, contain false and misleading information material to investment decisions in the market for the corporation's stock.

If this is true, it would serve the purposes of Section 13(a) to permit one who is being injured by this conduct to secure an injunction prohibiting future filings reflecting the same accounting practices. *Cf.* Mutual Shares Corporation v. Genesco, 384 F.2d 540 (2nd Cir. 1967).

## 634

(a).[17]  As the Supreme Court has recently observed:

> Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.

O'Shea v. Littleton, —— U.S. ——, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (Jan. 15, 1974).

Applying the same principle, I conclude that the present complaint does not allege facts sufficient to give plaintiff standing to seek injunctive relief under Section 13(a).  At the same time, I am not prepared to say that such facts could not be alleged.  Plaintiff will, accordingly, be given a reasonable opportunity to amend his complaint before Count III is dismissed.

Submit order.

---

17. This case is, accordingly, unlike those cases in which the plaintiff had standing to seek injunctive relief under the Exchange Act because future economic injury was threatened to him.  Mutual Shares Corporation v. Genesco, 384 F.2d 540 (2nd Cir. 1967) (a continuing violation of Rule 10b–5 designed to depress market value of plaintiff's stock).